JS-6

```
                              FILED
                       CLERK, U.S. DISTRICT COURT

                            08/31/2022

                     CENTRAL DISTRICT OF CALIFORNIA
                     BY: ___D. Brown___ DEPUTY
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. EDCV 22-85-SVW (KK) |
| Plaintiff, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER CERTIFYING EXTRADITABILITY |
| MASON HOWARD HARKNESS, | |
| A Fugitive from the Government of the Republic of Hungary. | |

The request of the United States of America for the issuance of an order certifying the extraditability of Mason Howard Harkness ("Harkness"), came on regularly for hearing before the Court on July 14, 2022. Upon consideration of the evidence, in particular the certified and authenticated documents submitted by the Government of the Republic of Hungary ("Hungary"),[1] and the pleadings and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

///

---

[1] Hungary submitted documents through the diplomatic channel that bear the certificate or seal of the Ministry of Justice, and in doing so, complied with Article 9 of the Treaty, as amended by Article 2 of the Protocol, with respect to authentication. See Dkts. 21, 30, 34, 37.

# I.

# **FINDINGS OF FACT**

**A.  ALLEGED SEXUAL ASSAULT OF THE VICTIM IN BUDAPEST**

Authorities of Hungary allege the following:

On February 4 and 5, 2015, Harkness, a United States citizen, was bar hopping in Budapest with a group of friends. See Dkt. 21 at 36, 70; Dkt. 34 at 19, 25-26. The victim, a French citizen, was also in this group. Dkt. 21 at 36; Dkt. 34 at 19, 25-26. On February 5, 2015, at approximately 4:45 a.m., Harkness and the victim left the club together.[2] See Dkt. 21 at 36, 70; Dkt. 34 at 39.

Approximately fifteen minutes later, Harkness forced the victim to the ground, sat on top of her, and covered her mouth with one hand while he used the other hand to unbutton her pants. See Dkt. 21 at 36, 70; Dkt. 34 at 27. The victim resisted Harkness by scratching and kicking him. See Dkt. 21 at 36, 70; Dkt. 34 at 27. In response, Harkness punched the victim twice in her face and told her to "shut up." See Dkt. 21 at 36, 70; Dkt. 34 at 27. The assault, combined with the alcohol she drank, caused the victim to move in and out of consciousness. See Dkt. 21 at 36, 71; Dkt. 34 at 28.

Harkness forcibly removed the victim's outer garments and brassiere, pulled her pants down to her knees, and tried to penetrate the victim's vagina with his penis. See Dkt. 21 at 36, 71; Dkt. 34 at 28. Although their genitals came into contact, Harkness was unable to penetrate the victim because his penis was not erect. See Dkt. 21 at 36, 71; Dkt. 34 at 28. Instead, Harkness forcefully inserted one finger into the victim's vagina. See Dkt. 21 at 36, 71; Dkt. 34 at 28. Harkness then stood up and left, leaving the victim nearly naked and moving in and out of consciousness on the

---

[2]  Closed-circuit television ("CCTV") recordings obtained by Hungarian authorities showed Harkness and the victim leaving the night club together, talking and walking hand in hand, and getting into a taxi. See dkt. 21 at 44. The victim appeared to be drunk in the recordings. See id.

1  street in the freezing cold.³  See Dkt. 21 at 36-37, 71; Dkt. 34 at 28.  He returned to
2  the club, where a witness later told Hungarian authorities that Harkness was seen with
3  a bloody scratch on the left side of his face and bloody hands.  See Dkt. 21 at 45-46.
4  According to the witness, Harkness claimed that he defended the victim because three
5  men attacked her.  See id. at 46.

6      A short time after the assault, the victim regained consciousness, stood up from
7  the ground, and tried to leave the vicinity of the assault.  See id. at 37, 71.  Witness
8  Krisztina Berta found the victim walking naked in the street with her jeans twisted
9  around her feet and the side of her face "smashed."  See id. at 37, 45, 71.  After
10 hearing the victim say, "help me," Ms. Berta took the victim to a nearby hotel.⁴  See
11 id.  The hotel receptionist told Hungarian authorities that the victim was in a state of
12 shock and that when she tried to speak, only unintelligible moans came out of her
13 mouth.  See id. at 45.

14     After the police and an ambulance were summoned, the victim was taken to
15 the hospital, where she stated that Harkness had strangled her.  See id. at 46; Dkt. 34
16 at 8-9.  A trace of a hand was visible on her neck.  See Dkt. 21 at 46.  Later, on
17 Facebook, the victim told a person who was with her at the hospital that she
18 remembered that Harkness hit her, that she could not breathe, that she laid on the
19 ground, and that Harkness tried to take her clothes off.  See id.

20     On February 5, 2015, the victim told Hungarian authorities that her attacker
21 was someone she met in a night club and that on the night of the assault they had
22 drinks at a bar together.  See id.; Dkt. 34 at 8, 19.  She referred to him as "Mason," a

---

³ The CCTV recordings obtained by Hungarian authorities did not show the assault.  However, the CCTV recordings showed the victim staggering alone in the street in the vicinity of the attack wearing only her underwear.  See Dkt. 21 at 45.  The CCTV footage also showed a man wearing a red t-shirt and dark pants staggering and struggling with his trousers holding a piece of clothing in his hand, which he later drops and leaves behind.  See id. at 44.  Because of the poor quality of the recordings made after the time of the attack, Hungarian authorities were not able to unambiguously identify Harkness merely on the basis of the recording.  See id. at 45.

⁴ The CCTV footage also showed the victim stop at a hotel, where someone saw her, and the arrival of an ambulance.  See Dkt. 21 at 44.

1  "guy from California."  See Dkt. 21 at 46; Dkt. 34 at 19.  She further reported that he
2  was called "Meszon Howie Harknesz" on Facebook, was married to Kate (or Kata)
3  Kiss, and was around twenty-five years old, tall, with short brown hair, tattoos on his
4  head, neck, and one of his hands.  See id.; Dkt. 34 at 9, 19.  She also related that he
5  spoke English.  See Dkt. 21 at 46; Dkt. 34 at 9.
6        A medical examination at the hospital revealed that as a result of the assault,
7  the victim suffered multiple skin abrasions on her face, back, and legs.[5]  See Dkt. 21 at
8  45, 71.  Also, a genetic expert analyzed the blood under nail clippings from the
9  victim's fingernails and opined that it likely came from Harkness.  See id. at 45.
10       On February 6, 2015, Hungarian authorities arrested Harkness and questioned
11 him.[6]  See id. at 44; Dkt. 34 at 33-42.  Harkness told authorities that he knew the
12 victim and had met her two or three weeks prior to the date of the attack.  See Dkt.
13 21 at 44; Dkt. 34 at 39.  He admitted that he left the night club with the victim, that he
14 strangled her, that he hurt her, and that he left her lying on the street without calling
15 for help.  See Dkt. 21 at 44; Dkt. 34 at 41-42.  However, he related that he did not
16 know the reason for his actions.  See Dkt. 21 at 44; Dkt. 34 at 42.  Harkness denied
17 having sex with the victim and claimed that they laughed, kissed, and had a good time,
18 but after his girlfriend called him, he could not remember anything else.  See Dkt. 21
19 at 44; Dkt. 34 at 41.  Nonetheless, Harkness admitted that on the night of the attack,
20 the victim began kissing him, and when he told her that he does not cheat on his
21 girlfriend, the victim slapped and pushed him.  See Dkt. 21 at 44; Dkt. 34 at 39.
22 Harkness responded by pushing the victim.  See Dkt. 21 at 44; Dkt. 34 at 39.

---

[5] While the victim's injuries took less than eight days to heal, given the particularly sensitive nature of the assault and the mode of commission, a forensic expert opined that there had been a real possibility that there could have been injuries to the victim's face from Harkness striking her with his fist (e.g., fractured cheekbone, nasal bone, and/or eye socket), which could take more than eight days to heal.  See Dkt. 21 at 45.  In addition, the victim later told authorities that two of her front teeth were damaged permanently in the attack, and as a result, she will need root canals and a crown.  See Dkt. 34 at 29.

[6] Authorities interviewed Harkness again on February 7, 2015, and January 24, 2017.  See Dkt. 21 at 80.

1	In addition to questioning Harkness, on February 6, 2015, Hungarian
2	authorities took photographs of him. See Dkt. 21 at 50-68. In those photographs,
3	Harkness has a number of tattoos, including tattoos on his neck, hand, and leg. See
4	id. Those photographs also show scratches on and injuries to his hands and face. See
5	id. Harkness told the authorities that the scratch marks on his face "might have
6	originated from the victim." See id. at 44. However, he could not tell the origin of
7	the injuries on his fist. See id.
8	On April 3, 2015, Hungarian authorities again met with the victim. See Dkt. 34
9	at 23-33. The victim again described the events of February 4 and 5, 2015, and
10	provided explicit details about how Harkness hit her, strangled her, attempted to rape
11	her, digitally penetrated her, and left her lying on the cold ground. See id. at 25-39.
12	She also told authorities that she attempted to defend herself by scratching Harkness's
13	face. See id. at 27. In fact, reliving the experience was so traumatic for the victim,
14	that she had a panic attack, forcing the Hungarian authorities to pause the interview
15	so that she could compose herself and finish the interview. See id. at 28.
16	**B.	HUNGARY SEEKS HARKNESS'S EXTRADITION**
17	On October 9, 2017, Hungarian authorities indicted Harkness and charged him
18	with Sexual Violence, in violation of Section 197 of the Criminal Code of Hungary,
19	and Attempted Aggravated Battery, in violation of Sections 164 and 10 of the
20	Criminal Code of Hungary. See dkt. 21 at 70-73, 80. However, because Harkness left
21	Hungary, the Hungarian court was not able to serve him with the deed of indictment.
22	See id. Consequently, on April 24, 2018, the Central District Court of Pest issued a
23	domestic warrant for Harkness's arrest. See id. at 36-38, 80.
24	On June 6, 2019, Hungary submitted a request to the United States for
25	Harkness's extradition on the above charges. See id. at 34. In accordance with its
26	obligations under the Treaty Between the Government of the United States and the
27	Government of the Republic of Hungary on Extradition, U.S.-Hung., Dec. 1, 1994, S.
28	Treaty Doc. No. 104-5 (1995), as amended by the Protocol to the Treaty Between the

1  Government of the United States of America and the Government of the Republic of
2  Hungary on Extradition signed 1 December 1994, U.S.-Hung., Nov. 15, 2005, S.
3  Treaty Doc. No. 109-14 (2006) (collectively, the "Treaty"), on December 13, 2021,
4  the United States filed a Complaint for Arrest and Extradition in this District and
5  obtained an arrest warrant issued by the Honorable Steve Kim, United States
6  Magistrate Judge for the Central District of California. Dkts. 1, 10.

       On December 16, 2021, the United States Marshals Service arrested Harkness. See Dkt. 10. At Harkness's initial court appearance on December 17, 2021, the United States moved for detention. See Dkts. 11, 12. The Court found no special circumstances existed warranting Harkness's release and ordered his continued detention. See Dkts. 11, 17.

       On July 14, 2022, the Court held a hearing to consider the evidence of criminality presented by Hungary and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty of convention." See Dkt. 38; 18 U.S.C. § 3184. Following the extradition hearing, the Court took the matter under advisement.

## II.

## **CONCLUSIONS OF LAW**

       Extradition is primarily an executive responsibility with a specially defined role for a judicial officer. See Prasoprat v. Benov, 421 F.3d 1009, 1014 (9th Cir. 2005). The Court is authorized by statute to determine whether to certify to the Secretary of State that the evidence submitted by the country requesting extradition is "sufficient to sustain the charge." 18 U.S.C. § 3184. If the Court so certifies, the Secretary of State then decides whether the fugitive should be surrendered to the requesting country. See 18 U.S.C. §§ 3184, 3186; Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016) (en banc); Prasoprat, 421 F.3d at 1012.

       To certify Harkness's extradition for the Secretary of State's decision on his surrender, the Court must find: (1) the Court has jurisdiction to conduct extradition

6

1  proceedings; (2) the Court has jurisdiction over the fugitive; (3) an extradition treaty is
2  in force and effect; (4) the fugitive is being sought for offenses for which the
3  applicable treaty permits extradition; and (5) there is sufficient evidence to establish
4  probable cause that the individual appearing in court is the fugitive who committed
5  the offense for which extradition is requested.  See Santos, 830 F.3d at 991; Manta v.
6  Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); Quinn v. Robinson, 783 F.2d 776, 783,
7  790 (9th Cir. 1986); Zanazanian v. United States, 729 F.2d 624, 625-26 (9th Cir. 1984).
8  Moreover, a magistrate judge "has no discretionary decision to make."  See Prasoprat,
9  421 F.3d at 1012.  If the elements of extradition are present, the magistrate judge must
10 certify extradition.  Id.
11      In the instant case, Harkness contests only one of these requirements: whether
12 there is sufficient evidence to establish probable cause.  After reviewing the pleadings
13 and arguments made by the parties at the July 14, 2022 extradition hearing, and as
14 detailed below, this Court reject Harkness' contention and finds all five certification
15 criteria are satisfied in this case.
16 **A.    SUBJECT MATTER JURISDICTION**
17      This Court has subject matter jurisdiction to conduct extradition proceedings
18 pursuant to 18 U.S.C. § 3184 and General Order 05-07 of United States District Court
19 for the Central District of California.  Harkness does not dispute this fact.
20 **B.    PERSONAL JURISDICTION**
21      This Court has personal jurisdiction over a fugitive found within its
22 jurisdictional boundaries.  18 U.S.C. § 3184 (stating a court "may, upon complaint
23 made under oath, charging any person found within [its] jurisdiction, . . . issue [its]
24 warrant for the apprehension of the person so charged").  The United States Marshals
25 Service arrested Harkness in San Luis Obispo, California on December 16, 2021.
26 Dkt. 10; see also In re Extradition of Mainero, 990 F. Supp. 1208, 1216 (S.D. Cal.
27 1997) (holding the court has jurisdiction over the respondents if they are before the
28 court).  Hence, because Harkness was "found within [this] jurisdiction," the personal

jurisdictional requirement of 18 U.S.C. § 3184 is met.  Harkness does not dispute this fact.

### C. HARKNESS IS SOUGHT FOR OFFENSES COVERED BY THE TREATY

Article 2 of the Treaty defines an extraditable offense as follows:

> 1. An offense shall be an extraditable offense if it is punishable under the laws of both Contracting Parties by deprivation of liberty for a period of one year, or by a more severe penalty.
>
> 2. An offense shall also be an extraditable offense if it consists of an attempt to commit, or participation in the commission of, an offense describe in paragraph 1 of this Article. . . .

Dkt. 21, Declaration of Monica Ager Jacobsen ("Jacobsen Decl."), attaching Treaty at 7-32; Treaty, art. 2.

In the instant case, Hungary charged Harkness with Sexual Violence, in violation of Section 197 of the Criminal Code of Hungary; and Attempted Aggravated Battery, in violation of Sections 164 and 10 of the Criminal Code of Hungary.  Sexual Violence and Attempted Aggravated Battery carry maximum terms of imprisonment of eight and three years, respectively.  See Dkt. 21 at 77.  Further, Harkness's alleged criminal activity, had it occurred in the United States, would be subject to prosecution as felonies under both federal and state law.  See 18 U.S.C. §§ 2241(a) (Aggravated Sexual Abuse), 2244(a) (Abusive Sexual Conduct); Cal. Penal Code §§ 243(d) (Battery), 243.4 (Sexual Battery); United States v. Khan, 993 F.2d 1368, 1372 (9th Cir. 1993) ("Many cases have held that dual criminality is satisfied even though the names of the crimes and the required elements were different in the two countries.").  Therefore, all of the foregoing offenses qualify as extraditable offenses under Article 2 of the Treaty.  See Jacobsen Decl., ¶ 2; Treaty, art. 2.  Harkness does not dispute this fact.

## D. THE TREATY BETWEEN THE UNITED STATES AND HUNGARY IS VALID AND IN FORCE

There is an extradition treaty in full force and effect between the United States and Hungary. See 18 U.S.C. § 3181 (Historical and Statutory Notes); see also Jacobsen Decl., ¶ 2. The State Department's conclusion that the Treaty is in full force and effect, as expressed in the declaration of Monica Ager Jacobsen, Attorney Adviser in the Office of the Legal Adviser for the Department of State, is entitled to deference. See Then v. Melendez, 92 F.3d 851, 853 (9th Cir. 1996); Mainero, 990 F. Supp. at 1216. Harkness does not dispute this fact.

## E. THE EXTRADITION REQUEST ESTABLISHES PROBABLE CAUSE THAT HARKNESS COMMITTED THE CHARGED OFFENSES

To certify Harkness as extraditable, the Court must find probable cause to believe that the crimes charged by Hungary were committed and the person before the Court committed them.[7] See Hoxha v. Levi, 465 F.3d 554, 561 (3d Cir. 2006). Evidence is sufficient and probable cause is established if "there was any evidence warranting the finding that there was a reasonable ground to believe the accused guilty." Mirchandani v. United States, 836 F.2d 1223, 1226 (9th Cir. 1988). The Supreme Court stated in Benson v. McMahon:

> [T]he proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding

---

[7] In this case, there is no dispute that the person appearing before the Court is the same "Mason Howard Harkness" wanted by Hungary in its extradition request. Harkness does not dispute this fact.

9

| | |
|---|---|
| 1 | of the accused, either by imprisonment or under bail, to ultimately |
| 2 | answer to an indictment, or other proceeding, in which he shall be finally |
| 3 | tried upon the charge made against him. |
| 4 | 127 U.S. 457, 463 (1888); see also Collins v. Loisel, 259 U.S. 309, 316 (1922) ("The |
| 5 | function of the committing magistrate is to determine whether there is competent |
| 6 | evidence to justify holding the accused to await trial, and not to determine whether |
| 7 | the evidence is sufficient to justify a conviction."); Fernandez v. Phillips, 268 U.S. 311, |
| 8 | 312 (1925) ("Competent evidence to establish reasonable grounds is not necessarily |
| 9 | evidence competent to convict."); Barapind v. Enomoto, 400 F.3d 744, 752 (9th Cir. |
| 10 | 2005) (en banc). |
| 11 | Thus, in extradition proceedings, hearsay is permitted and courts routinely rely |
| 12 | on summaries of underlying evidence when assessing probable cause.[8] See, e.g., |
| 13 | Manta v. Chertoff, 518 F.3d 1134, 39-40, 1145-47 (9th Cir. 2008) (probable cause |
| 14 | determination of magistrate judge upheld where jurist relied on investigation report |
| 15 | written by prosecutor); Bovio v. United States, 989 F.2d 255, 259-61 (7th Cir. 1993) |
| 16 | (probable cause determination of magistrate judge upheld where jurist relied on sworn |
| 17 | statements of prosecutor and investigator who investigated and interrogated |
| 18 | witnesses); Zanazanian, 729 F.2d at 626-27 (unsworn statements by police officers |
| 19 | summarizing statements of witnesses were admissible and competent evidence in |
| 20 | extradition hearing); In re Extradition of Chan Hon-Ming, No. 06-M-296 (RLM), |
| 21 | 2006 WL 3518239, *8 (E.D.N.Y. Dec. 6, 2006) (probable cause sufficient based on |
| 22 | affidavit that summarized evidence). |

---

[8] See Collins, 259 U.S. at 317; Mainero v. Gregg, 164 F.3d 1199, 1206 (9th Cir. 1999) ("it is well settled in this circuit that evidence [in an extradition proceeding] is not incompetent simply because it is hearsay"), superseded by statute on other grounds, Pub. L. No. 105-277, § 2242, 1999 U.S.C.C.A.N. (112 Stat. 2681); Emami v. U.S. Dist. Ct. for N. Dist. of California, 834 F.2d 1444, 1451 (9th Cir. 1987) ("In the Ninth Circuit it has been repeatedly held that hearsay evidence that would be inadmissible for other purposes is admissible in extradition proceedings."). In fact, "[a] determination of probable cause in an extradition proceeding may rest entirely upon hearsay." In re Ryan, 360 F. Supp. 270, 273 (E.D.N.Y. 1973), aff'd sub nom. Ryan, In re the Extradition of, 478 F.2d 1397 (2d Cir. 1973).

1    Here, on the night in question, the testimonies of the victim, witnesses, and
2 Harkness establish that the victim left the club with Harkness after they had been
3 drinking and entered into a taxi with him. The testimonies of the victim and
4 witnesses also establish that Harkness assaulted the victim and left her lying in the
5 street freezing and naked. Further, Harkness admitted to authorities that he strangled
6 the victim, hurt her, left her lying in the street, and did not call for help. Harkness
7 also acknowledged to authorities that he had scratch marks on his face that "might
8 have originated from the victim."
9    Notably, the testimonies of the victim, the witnesses, and Harkness are
10 supported by the physical evidence in the case, including the CCTV footage and
11 photographs of Harkness. Further, expert testimony supports the charged offense.
12 In addition to detailing the extent of the victim's injuries and noting that they were
13 consistent with the witness and victim statements, a forensic expert opines that based
14 on the type of injuries she suffered, her injuries could have taken more than eight days
15 to heal. A genetic expert also stated that Harkness's biological residue was under the
16 victim's nails.
17    Finally, the victim identified and described her attacker, as having short brown
18 hair and tattoos on his face, neck, and one of his hands. The photographs taken of
19 Harkness by the Hungarian authorities following his initial arrest, corroborate the
20 victim's description.
21    Notwithstanding the foregoing, Harkness attempts to undermine Hungary's
22 evidence of probable cause by questioning the credibility of the victim, highlighting
23 the breadth of what she told the authorities at her February 5, 6, and April 3, 2015,
24 interviews. See Dkt. 28 at 8, 19-20. However, Harkness's argument is not supported
25 by the law or the evidence.
26    The Ninth Circuit, consistent with other circuits, has held that credibility
27 determinations are outside the scope of an extradition proceeding. See, e.g., Santos,
28 830 F.3d at 993 ("an individual contesting extradition may not . . . call into question

the credibility of the government's offer of proof"); Noeller v. Wojdylo, 922 F.3d 797, 807 (7th Cir. 2019) ("Evidence that contradicts the demanding country's proof or poses questions of credibility—i.e., contradictory evidence—is off-limits."); Shapiro v. Ferrandina, 478 F.2d 894, 905 (2d Cir. 1973) ("The judge's refusal to examine the credibility of the testimony and statements included in the translated material was clearly proper, since the declarants were not before him."). While the "credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate," Quinn, 783 F.2d at 815, a lack of credibility generally "does not completely obliterate the evidence of probable cause." Man-Seok Choe, 525 F.3d at 740 ("[Witness's] lack of credibility is merely a weakness in Korea's case.") (internal quotation marks, citation, and alterations omitted); cf. Barapind v. Enomoto, 400 F.3d 744, 749-50 (9th Cir. 2005) (en banc) (finding that witness's recantation did not obliterate probable cause because recantation "constituted conflicting evidence, the credibility of which could not be assessed without a trial.").

Likewise, this Court has followed such precedent and rejected probable cause challenges based on attacks to the credibility of witness statements provided in support of extradition requests. For example, in In re Extradition of Lara Gutierrez, a fugitive claimed that the eyewitness statement "border[ed] on incredible." No. 16-cv-05061, 2017 WL 8231237, at *4 (C.D. Cal. Feb. 22, 2017). The Court rejected this claim and found that the statement satisfied the probable cause standard:

> [T]hese types of arguments about the credibility of [an eyewitness's] account are misplaced in these proceedings. The circumscribed nature of this Court's inquiry does not permit the Court to weigh the credibility of [the eyewitness's] statements. Rather, the Court must determine whether any competent evidence establishes probable cause.

Id. Similarly, in In re Extradition of Acevedo, the Court rejected another fugitive's claim that a witness statements was "suspect and more likely than not false." No. 16-1766, 2017 WL 3491749, at *8 n.4 (C.D. Cal. Aug. 11, 2017). The Court explained

that notwithstanding the fugitive's claim, the evidence did not undermine a finding of probable cause:

> [T]hese arguments raise factual disputes regarding the weight and credibility of evidence. Such determinations are beyond the scope of this extradition proceeding and are properly reserved for trial in the requesting country.

Id.

In light of this case law, the fact that the victim recalled and provided more detailed information each time she met with Hungarian authorities than when she first met with them, does not impugn her credibility. Further, as detailed above, the victim's statements are corroborated by the testimonies of other percipient witnesses, physical evidence, and expert testimonies in the case.[9]

All of these facts support the Court's finding that there is probable cause to believe Harkness committed the offenses for which his extradition is sought.

## F. THIS COURT DEFERS TO THE DETERMINATION OF THE CENTRAL DISTRICT COURT OF PEST (HUNGARY) THAT HUNGARY'S PROSECUTION OF HARKNESS IS NOT BARRED UNDER HUNGARIAN LAW

Harkness also argues extradition is barred because the case in Hungary is not ripe due to a "procedural defect." See Dkt. 28 at 12. Specifically, he asserts that because the victim failed to comply with a Hungarian law that requires her to submit a private motion within thirty days of the offense, the Hungarian prosecution is barred and not "ripe" for extradition. See id. at 12-13.

---

[9] Should Harkness wish to challenge the victim's credibility by pointing to any alleged inconsistencies between her statements to authorities, he must do so in proceedings before the Hungarian court, and not before this Court in an extradition proceeding. See, e.g., Bovio, 989 F.2d at 259 (citing Eain v. Wilkes, 641 F.2d 504, 511 (7th Cir. 1981)) (relator "has no right to attack the credibility of either [affiant] at this stage of the proceedings; issues of credibility are to be determined at trial."). Unlike this Court, the Hungarian court will have before it all of the evidence, and thus be able to assess the victim's credibility, especially if she chooses to testify.

1		In response to Harkness's claim, the United States offers the opinion of Dr.
2	Miklós Ferenc Tóth, Judge of the Central District Court of Pest, who states that,
3	where the accused is alleged to have committed both sexual violence and felony
4	attempted battery, "Hungarian law does not require a private motion from the victim
5	for the criminal prosecution to be initiated." Dkt. 30-1 at 4. Thus, the Hungarian
6	jurist concludes that the timing of the victim's private motion is "not relevant" and
7	"has no legal effect in this case . . . ." Id.
8		It is well-settled that it is not the role of a United States court to opine on a
9	foreign government's interpretation of its own law. See, e.g., Grin v. Shine, 187 U.S.
10	181, 190 (1902) ("[I]t can hardly be expected of us that we should become conversant
11	with the criminal laws of [the requesting country], or with the forms of warrants of
12	arrest used for the apprehension of criminals."); Basic v. Steck, 819 F.3d 897, 901 (6th
13	Cir.) (concluding "[w]e will not second guess th[e] determination" by the Government
14	of Bosnia that a "[d]irective to find and arrest" the fugitive constituted the "arrest
15	warrant" required under the applicable extradition treaty), cert. denied, 137 S. Ct. 196
16	(2016); Skaftouros v. United States, 667 F.3d 144, 160 n.20 (2d Cir. 2011) (noting "we
17	defer to the Greek courts, which may consider whether [the fugitive] or the Greek
18	prosecutors have the better of the argument" regarding whether the warrant
19	underlying the extradition request was valid under Greek law); In re Extradition of
20	Jimenez, No. 14-2319-SAG, 2014 WL 7239941, at *1-2 (D. Md. Dec. 16, 2014)
21	(rejecting relator's claim that extradition to Costa Rica not permitted under relevant
22	treaty because sentence has lapsed, noting that court would not "question the
23	reliability or trustworthiness of a judicial decree from a foreign nation" which stated
24	that sentence had not lapsed); In re Extradition of Robertson, No. 11-MJ-0310-KJN,
25	2012 WL 5199152, at *7-12 (E.D. Cal. Oct. 19, 2012) (committing relator for
26	extradition for enforcement of sentence, and declining to examine Canadian law and
27	Canada's representation that "long term supervision order" forms part of relator's
28	sentence and is not separate from it).

1  The principle that a foreign country should not be required to prove to a
2  United States judge that it is properly construing its own laws is supported by general
3  notions of international comity and respect for foreign nations' sovereignty.  See
4  Koskotas v. Roche, 931 F.2d 169, 174 (1st Cir. 1991); Ahmad, 910 F.2d at 1067-68; In
5  re Appl. for Order for Judicial Assistance in Foreign Proceeding in Labor Ct. of Braz.,
6  466 F. Supp. 2d 1020, 1028 (N.D. Ill. 2006) ("American courts should treat foreign
7  law the way American courts want foreign courts to treat American law: avoid
8  determining foreign law whenever possible.").  The principle is further supported by
9  the prudential policy of avoiding the high risk that a United States court might
10 erroneously interpret the law of a foreign country.  See Sainez v. Venables, 588 F.3d
11 713, 717 (9th Cir. 2009); In re Assarsson, 635 F.2d 1237, 1244 (7th Cir. 1980).
12     Accordingly, rather than attempt to interpret and apply Hungarian law, this
13 Court defers to the Central District Court of Pest's interpretation and application of
14 its own laws.  See Sainez, 588 F.3d at 717; Koskotas, 931 F.2d at 174; Ahmad, 910
15 F.2d at 1067-68; Assarsson, 635 F.2d at 1244; Labor Ct. of Braz., 466 F. Supp. 2d at
16 1028.

**G.   HUMANITARIAN CONSIDERATIONS ARE WITHIN THE SECRETARY OF STATE'S SOLE CONSIDERATION, PURSUANT TO THE RULE OF NON-INQUIRY**

20     Harkness also argues humanitarian grounds, specifically the treatment he may
21 receive in a Hungarian prison, should bar his extradition.  However, this argument
22 fails because it is outside of the scope of this Court's jurisdiction.
23     It is well-settled under the rule of non-inquiry that it is the role of the Secretary
24 of State, not a court, to determine whether extradition should be denied on
25 humanitarian grounds or on account of the treatment a fugitive would likely receive

on return to the requesting country. See Prasoprat, 421 F.3d at 1016.[10] As the Ninth Circuit has explained,

> The rule of non-inquiry is based on the principle that the Secretary of State's exercise of discretion regarding whether to extradite an individual may be based not only on "considerations individual to the person facing extradition" but "may be based on foreign policy considerations instead."

Id. (quoting Lopez-Smith v. Hood, 121 F.3d 1322, 1326 (9th Cir. 1997).[11] The rule respects the unique province of the Executive Branch to ensure that the United States upholds its international obligations under its extradition treaties and to evaluate claims of possible future mistreatment at the hands of a foreign state, not to mention its ability to obtain assurances of proper treatment (if warranted), its capacity to provide for appropriate monitoring overseas of a fugitive's treatment, and its exclusive responsibility for conducting foreign relations. "It is not that questions about what awaits the [fugitive] in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed." United

---

[10] See Quinn, 783 F.2d at 789-90 (Secretary of State has "sole discretion . . . to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive"), cert. denied, 479 U.S. 882 (1986); see also Hoxha, 465 F.3d at 563 (under rule of non-inquiry, "humanitarian considerations are within the purview of the executive branch and generally should not be addressed by the courts in deciding whether a petitioner is extraditable"); Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (allegations that fugitive may be tortured or killed if returned to Mexico are matters "within the exclusive purview of the executive branch"); Martin v. Warden, Atlanta Pen., 993 F.2d 824, 830 n.10 (11th Cir. 1993) (reaffirming adherence to principles that "judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate" and that such considerations "are matters properly reviewed by the Department of State").

[11] See Lopez-Smith, 121 F.3d at 1327 (courts generally refrain from examining penal systems of requesting nations); Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983) ("The rationale is that such matters are to be determined solely by the executive branch"), superseded by statute on other grounds, Pub. L. No. 105-277, § 2242, 1999 U.S.C.C.A.N. (112 Stat. 2681). As Justice Holmes said, "[w]e are bound by the existence of an extradition treaty to assume that the trial will be fair." Glucksman v. Henkel, 221 U.S. 508, 512 (1911).

16

States v. Kin-Hong, 110 F.3d 103, 111 (1st Cir. 1997).  In other words, "[t]he Secretary [of State] exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review," Sidali v. INS, 107 F.3d 191, 195 n.7 (3d Cir. 1997), including humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the receiving country, see Quinn, 783 F.2d at 790-91; Ntakirutimana v. Reno, 184 F.3d 419, 430 (5th Cir. 1999).  Thus, the Secretary has "sole discretion . . . to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive." Quinn, 783 F.2d at 789-90.

      Moreover, respect for and confidence in the Executive's exercise of discretion is well-placed:

> It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds.  So far as we know, the Secretary never has directed extradition in the face of proof that the extraditee would be subjected to procedures or punishment antipathetic to a federal court's sense of decency.  Indeed, it is difficult to conceive of a situation in which a Secretary of State would do so.

Ahmad, 910 F.2d at 1067 (internal citations omitted); accord Martin, 993 F.2d 830 n.10 ("[H]umanitarian considerations are matters properly reviewed by the Department of State.").  As the Supreme Court has observed, the Executive is "well situated" to assess the adequacy of both the foreign country's legal system and any assurances the foreign country may give about the protection of prisoners. Munaf v. Geren, 553 U.S. 674, 702 (2008); Trinidad y Garcia v. Thomas, 683 F.3d 952, 961 (2012) (Thomas, J., concurring) (noting that the Secretary "may make confidential diplomatic inquiries and receive confidential diplomatic assurances about the treatment of an extradite" if necessary).

   Harkness argues the rule of non-inquiry is not binding on this Court by citing dicta from Gallina v. Fraser, 278 F.2d 77, 79 (2d Cir. 1960). In Gallina, the Second Circuit speculated that, hypothetically, there could be an extreme case warranting an exception to the rule of non-inquiry. See Dkt. 28 at 9. Citing Mainero v. Gregg, 164 F.3d 1199, 1210 (9th Cir. 1999), Harkness notes that the Ninth Circuit speculated about the possibility of a Gallina exception. See Dkt. 52 at 9.

   However, in the more than sixty years since Gallina, no court has applied its dicta to create a humanitarian exception. See, e.g., Martin, 993 F.2d at 830 n.10 ("We explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate."). In fact, "[t]he Second Circuit itself has . . . distanced itself from Gallina." Id. (citing Ahmad, 910 F.2d at 1066). "Rather, humanitarian considerations are matters properly reviewed by the Department of State." Id. (internally citing Escobedo, 623 F.2d at 1107); Gill v. Imundi, 747 F. Supp. 1028, 1049 (S.D.N.Y. 1990) ("the promise of Gallina's dictum [has] . . . been excised" by Ahmad).[12]

   If Harkness has any concerns about treatment he may experience in Hungary, he must address those concerns with the Secretary of State following certification of extraditability by this Court. The Secretary of State, who has access not only to the State Department's 2020 Human Rights Report relied upon by Harkness, as well as the vast resources of the United States State Department, is in the best position to determine whether Harkness's extradition is appropriate. Therefore, this Court will abide by the rule of non-inquiry and reserve arguments regarding humanitarian concerns for the Secretary of State.

///

///

---

[12] Although Harkness cites In re Burt, 737 F.2d 1477, 1487 (7th Cir. 1984), he offers no evidence that his extradition is not based on diplomatic considerations without regard to such constitutionally impressible factors as race, color, sex, national original, or political beliefs . . . ."

## III.

## **CONCLUSION**

For all of the foregoing reasons, the Court finds Hungary's extradition request contains sufficient evidence of probable cause on each of the criminal charges for which Hungary seeks Harkness's extradition. Hence, having found that all of the requirements for certification of extradition have been satisfied, the Court certifies the extradition of Harkness to the Secretary of State and commits him to custody pursuant to 18 U.S.C. § 3184 and in accordance with the following order.

**THEREFORE,** pursuant to 18 U.S.C. § 3184 and the above findings and legal conclusion, **THE COURT HEREBY CERTIFIES** the extradition of MASON HOWARD HARKNESS to the Republic of Hungary, on the above offenses for which extradition was requested.

**IT IS FURTHER ORDERED** that MASON HOWARD HARKNESS remain committed to the custody of the United States Marshals Service pending final decision on extradition and surrender by the Secretary of State pursuant to 18 U.S.C. § 3186.

**IT IS FURTHER ORDERED** that the Clerk of the Court forthwith deliver to the Assistant U.S. Attorney a certified copy of this Findings of Fact and Conclusions of Law; Order Certifying Extraditability and forward without delay certified copies of the same to the Secretary of State (to the attention of the Office of the Legal Adviser) and the Director, Office of International Affairs, Criminal Division, U.S. Department of Justice, Washington D.C., for appropriate disposition.

Dated: August 31, 2022

_____
HONORABLE KENLY KIYA KATO
United States Magistrate Judge